UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANTHONY WALTER PUIG,

v.  Case No. 8:01-cr-252-T-17MSS
    8:05-cv-1815-T-17MSS

UNITED STATES OF AMERICA.
_____

O R D E R

This cause is before the Court upon Defendant Anthony Walter Puig (Puig's) motion to vacate, set aside, or correct an allegedly illegal sentence pursuant to 28 U.S.C. § 2255.  Cv. Doc. 1; Cr. Doc. 130

**BACKGROUND**

In October 1997, Puig's girlfriend, Stella Herndon, met with Mark Grenier, a long-time friend and drug dealer. Cr. Doc. 110 at 134-36. Herndon asked Grenier if he could obtain a kilogram of cocaine for her and Puig, as they were looking for a better price than they had been paying. Id. Grenier, an informant for the Tampa Police Department, called Detective Gary Russ, who instructed Grenier to proceed with the transaction, treating Detective Russ as his source. Cr. Doc. 110 at 23-25, 130, 137-38.

Grenier called Herndon and gave her a price. Cr. Doc. 110 at 138. Herndon spoke with Puig and then told Grenier that the price was too high. Cr. Doc. 110 at 139.

They eventually agreed to a price of $18,000 for the kilogram of cocaine. Id. Later, Herndon paged Grenier, and they had a three-way phone conversation with Detective Russ. Cr. Doc. 110 at 140. They agreed to meet at a convenience store, but Herndon was not there when Grenier and Detective Russ arrived. Cr. Doc. 110 at 26, 140-41. Grenier called the phone number that Herndon had used, and Puig answered. Cr. Doc. 110 at 26-27, 141-42, 153. Puig told Grenier that Herndon was supposed to be meeting them right then. Cr. Doc. 110 at 27, 141-42. Puig explained to Grenier that Grenier was at the wrong convenience store and directed Grenier to the right location. Id.

Grenier and Detective Russ drove to the store as directed by Puig, and Herndon was there, waiting in a pickup truck. Cr. Doc. 110 at 27, 145. Grenier got into the truck with Herndon, who explained that Puig did not want to meet with anyone else. Cr. Doc. 110 at 146. Herndon drove Grenier to the house where she and Puig lived. Cr. Doc. 110 at 28-29, 146. Once there, she got out of the truck, and Puig immediately took her place in the driver's seat. Cr. Doc. 110 at 146. He left with Grenier, driving fast and erratically, until he got to a secluded spot, where they discussed Puig's drug dealing. Cr. Doc. 110 at 146-51. Puig drove Grenier back to the convenience store, where Puig told Grenier and Detective Russ that he would contact them the next day, after he had gotten his money. Cr. Doc. 110 at 40, 156.

The next day, Herndon paged Grenier. Cr. Doc. 110 at 40, 158-59. Grenier and

Detective Russ called Herndon, who said that they had the money and wanted to meet at a secluded location to buy the cocaine. Cr. Doc. 110 at 40, 159. Russ, however, refused to meet at such an isolated spot. Id. After some discussion, in which Puig could be heard in the background directing Herndon, they agreed to meet that day at a Circle K store. Cr. Doc. 110 at 41-43, 161.

Grenier and Detective Russ drove into the Circle K parking lot and parked next to Puig's truck. Cr. Doc. 110 at 45-48, 163. Puig was in the driver's seat, alone. Cr. Doc. 110 at 48, 163. Herndon walked out of the store and went to the driver's side of Puig's truck. Cr. Doc. 110 at 45-49, 163. Puig handed Herndon a purse, which contained $18,000. Cr. Doc. 110 at 49, 54; Cr. Doc. 111 at 71. Herndon got into Detective Russ's car with the purse and said, "Let's go." Cr. Doc. 110 at 49. Russ, however, refused to go elsewhere; he had the kilogram of cocaine on the rear seat of his car and he wanted to do the deal right there. Cr. Doc. 110 at 49; Cr. Doc. 111 at 71. After a few moments he realized that they had reached a stalemate, so he gave the arrest signal. Cr. Doc. 110 at 50. Police converged on the parking lot and arrested Puig and Herndon. Cr. Doc. 110 at 53; Cr. Doc. 111 at 48.

Puig and Herndon failed to show up for their trial and remained fugitives for several months. Cr. Doc. 110 at 60-63. Puig eventually was apprehended, and he was convicted following a trial of conspiring to possess 500 grams or more of cocaine, with the intent to distribute it, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(ii)

(count one), and attempting to possess 500 grams or more of cocaine, with the intent to distribute it, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B)(ii) and 18 U.S.C. § 2 (count two). Cr. Doc. 92. The district court sentenced Puig as a career offender to serve 360 months' imprisonment. Cr. Docs. 91, 92.

Puig directly appealed his conviction and sentence to the United States Court of Appeals for the Eleventh Circuit (Appeal No. 03-10064-JJ). Cr. Doc. 97. On May 13, 2004, the Eleventh Circuit affirmed Puig's conviction and sentence. Cr. Doc. 123. Puig timely sought certiorari review in the Supreme Court. On October 4, 2004, the Supreme Court denied Puig's petition for writ of certiorari. Puig v. United States, 125 S. Ct. 95 (2004).

On September 18, 2005, Puig filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. Doc. 1. The motion was timely. See 28 U.S.C. § 2255 ¶ 6(1); Washington v. United States, 243 F.3d 1299, 1300 (11th Cir. 2001) (when prisoner timely petitions for certiorari review, section 2255 limitation period "begins to run when the Supreme Court denies certiorari or issues a decision on the merits.").

Puig raises eight claims in his section 2255 motion, all of which relate to the district court's jury instructions. In claims one through six he asserts defects in the court's instructions, while in claims seven and eight he asserts that his lawyers were ineffective in addressing those instructions at trial and on appeal, respectively. Cv.

Doc. 1. For all of the reasons explained below, Puig is not entitled to relief and his motion to vacate will be **DENIED**.

## DISCUSSION

A section 2255 motion is not a surrogate for a direct appeal. United States v. Frady, 456 U.S. 152, 165 (1982). Rather, relief under section 2255 "is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." Richards v. United States, 837 F.2d 965, 966 (11th Cir. 1988). Thus, nonconstitutional claims can be raised on collateral review only when the alleged error constitutes a "fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." Reed v. Farley, 512 U.S. 339, 348 (1994).

In Lynn v. United States, 365 F.3d 1225, 1232-34 (11th Cir.), cert. denied, 543 U.S. 891 (2004), for example, the Eleventh Circuit Court of Appeals affirmed the denial of a section 2255 motion because the claims of improper vouching and sequestration were "fundamentally trial errors that . . . are not cognizable in a § 2255 proceeding." Puig's myriad challenges to the jury instructions, which are discussed in more detail below, likewise are not cognizable on collateral attack. See, e.g., Margoles v. United States, 407 F.2d 727, 735 (7th Cir. 1969) ("Petitioner's last contention, that the trial court improperly instructed the jury as to burden of proof, is

without merit . . . since this issue is improperly raised on a collateral attack under § 2255."); Hollbrook v. United States, 441 F.2d 371, 372 (6th Cir. 1971) (jury instructions concerning events outside of charged conspiracy and permitting jury to use certain evidence "cannot be challenged on motions pursuant to 28 U.S.C. § 2255").

The Supreme Court has stated that, "before obtaining collateral relief for errors in the jury charge[, a prisoner must show that] the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely [that] 'the instruction is undesirable, erroneous, or even universally condemned.'" Frady, 456 U.S. at 169 (quoting Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). Puig's claims do not come close to satisfying this standard.

In his first claim, Puig asserts that the district court erred in instructing the jury on conspiracy to possess cocaine with the intent to distribute it rather than conspiracy to distribute cocaine and that the court defined neither "possession" nor "distribution." Cv. Doc. 1 at 6. In his second claim, he argues that the court failed to instruct the jury on a "one-time buyer/seller" defense. Cv. Doc. 1 at 7. In his third claim, he argues that the court failed to properly instruct the jury on the elements of attempted possession . Cv. Doc. 1 at 9-10. In his fourth claim, he argues that the court failed to properly instruct the jury on constructive possession. Cv. Doc. 1 at 12-15. In his fifth claim, he argues that the court failed to properly instruct the jury as to "aborted intent." Cv.

Doc. 1 at 16-18. In his sixth claim, seemingly an amalgam of claims four and five, he argues that the court failed to instruct the jury "that Puig could be found not guilty on count two should the jury determine: Hendron lacked criminal intent when she aborted the attempted purchase and never had constructive possession." Cv. Doc. 1 at 18-20 (citations omitted). These claims raise neither constitutional issues nor issues that assert a "fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." Reed, 512 U.S. at 348. To the contrary, they are garden-variety complaints about the specifics of the jury charge. They are not cognizable on collateral attack under section 2255. See Lynn, 365 F.3d at 1232-34.

Even if Puig's claims otherwise were cognizable, they would be procedurally barred if they previously were available and were not raised on direct appeal, unless Puig establishes cause for the default and actual prejudice resulting from the asserted errors. See McCoy v. United States, 266 F.3d 1245, 1258-59 (11th Cir. 2001).[1] Puig could have raised every one of his challenges to the jury instructions on direct appeal, but he did not. Nor, indeed, did he raise them at trial. He attempts to excuse his fatal procedural default by asserting that his lawyers were ineffective in failing to raise

---

[1] A petitioner need not show cause and prejudice if "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Lynn, 365 F.3d at 1235. There is, of course, no evidence–or even an assertion–in this case that Puig is actually innocent, so this exception does not apply. See id.

these issues, both at trial and on direct appeal. Cv. Doc. 1. To establish this excuse, however, he must show both that (1) his lawyers' performance fell below an objective standard of reasonableness and that (2) there is a reasonable probability that his lawyers' errors affected the outcome of the proceeding. See Strickland v. Washington, 466 U.S. 668, 687-94 (1984). "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. Thus, if the defendant fails to show that he is prejudiced by the alleged errors of counsel, this Court may reject the defendant's claim without determining whether the counsel's performance was deficient. See Coulter v. Herring, 60 F.3d 1499, 1504 & n.8 (11th Cir. 1995). Puig cannot satisfy either part of this justifiably high standard.

The benchmark for judging any claim of ineffective assistance of counsel, however, is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. Strickland, 466 U.S. at 686. Because a lawyer is presumed to be competent to assist a defendant, the burden is on the accused to demonstrate the denial of the effective assistance of counsel. United States v. Cronic, 466 U.S. 648, 658 (1984).

"Judicial scrutiny of counsel's performance must be highly deferential." Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc). "Courts must 'indulge [the] strong presumption' that counsel's performance was reasonable

and that counsel 'made all significant decisions in the exercise of reasonable professional judgment.' " Id. (quoting Strickland, 466 U.S. at 689-90). Courts "must avoid second-guessing counsel's performance" and "need not attempt to divine the lawyer's mental processes underlying the strategy." Id. at 1314, 1315 n.16. Therefore, "counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy." Id. at 1314. To prevail, a petitioner "must establish that no competent counsel would have taken the action that his counsel did take." Id. at 1315. If the record is incomplete or unclear about counsel's actions, then it is presumed that counsel exercised reasonable professional judgment.  See Chandler, 218 F.3d at 1314-15 n.15. Thus, the presumption afforded counsel's performance "is not . . . that the particular defense lawyer in reality focused on and, then, deliberately decided to do or not to do a specific act." Id. Rather, the presumption is "that what the particular defense lawyer did at trial . . . were acts that some reasonable lawyer might do." Id. Moreover, "[t]he reasonableness of a counsel's performance is an objective inquiry." Id. at 1315.

For a petitioner to show deficient performance, he "must establish that no competent counsel would have taken the action that his counsel did take." Id. To uphold a lawyer's strategy, a court "need not attempt to divine the lawyer's mental processes underlying the strategy." Id. at 1315 n.16. "No absolute rules dictate what is reasonable performance for lawyers."  Id. at 1317.  Accordingly, there is no

absolute duty to investigate particular facts or a certain line of defense, nor is counsel required to present every nonfrivolous defense. <u>Crawford v. Head</u>, 311 F.3d 1288 (11th Cir. 2002).

To establish prejudice, the petitioner must prove that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." <u>See Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999) (internal quotation marks and citations omitted). This is a heavier burden than the burden of establishing plain error on appeal. <u>See Frady</u>, 456 U.S. at 164.

In this case, Puig's arguments about his jury instructions are so meritless that it is apparent (1) that his lawyer acted reasonably in not challenging the instructions on those grounds and (2) that Puig was not prejudiced by his lawyers' "failure" to argue (at trial or on direct appeal) that the district court should have given the instructions to which Puig now claims entitlement. As is explained below, Puig could not have obtained any relief, either at trial or on appeal, based on these challenges to the court's instructions.

In Puig's first claim, which he describes as his "Presumption and Inference Claim," he seems to be arguing that the district court's conspiracy instruction was inadequate and also, perhaps, that the evidence against him was insufficient. Cv. Doc. 1 at 5-7. The conspiracy instruction, however, was correct; it explained that count one charged Puig with conspiring to "knowingly possess cocaine with intent to distribute

it" and permitted the jury to find Puig guilty only if the jurors agreed beyond a reasonable doubt "first, that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and lawful [sic] plan as charged in the Indictment and, second, that the defendant, knowing the unlawful purpose of the plan, willfully joined it." Doc. 1 (attachment 2 at 79-81). See 11th Cir. Pattern Jury Instr. (Crim.) 87 (2003).

Furthermore, to the extent that Puig may be challenging the sufficiency of the evidence, the evidence of his and Herndon's attempt to obtain the kilogram of cocaine, discussed above amply supported the jury's finding of guilt.[2]

In his second claim, Puig argues that the district court erred in "fail[ing] to inform the jury that they could find the mere single purchase or sale of narcotics is not an intent to distribute conspiracy without more because not every conditional agreement to commit an offense is a conspiracy." Cv. Doc. 1 at 7. He adds that "[t]he record trial evidence does not support the one-time purchase was for resale." Cv. Doc. 1 at 8. The court correctly instructed the jury on the elements of conspiracy. Furthermore, Puig's suggestion that this was merely a "one-time purchase [and not]

---

[2] To the extent that Puig may also be arguing that the court abused its discretion in allowing extrinsic evidence of Puig's prior drug dealing, that argument is not cognizable on collateral attack. See generally Lynn, 365 F.3d at 1232-34. In any event, that evidence was admissible because Puig's intent at the site of the transaction was at issue. See United States v. McDowell, 705 F.2d 426, 429 (11th Cir. 1983). Indeed, the court instructed the jury that it could consider that extrinsic act evidence only on the issue of intent, and only if the jury found beyond a reasonable doubt that Puig had committed the acts charged in the indictment. Cv. Doc. 1 (attachment 2 at 74).

an agreement for future purchases" is irrelevant here because he conspired with Herndon to obtain (and distribute) the cocaine. It does not matter whether he also conspired with the informant/seller. See United States v. Morales, 868 F.2d 1562, 1573 (11th Cir. 1989) (conspiracy requires proof "that an agreement existed between Kolb and at least one other person to distribute cocaine and that Kolb knowingly and voluntarily joined or participated in the conspiracy"). Moreover, the evidence showed that, in addition to the kilogram involved here (a distribution quantity), Puig and Herndon had a history of buying kilograms of cocaine, see Cr. Doc. 110 at 136. This evidence adequately showed their intent to distribute the cocaine. Stated differently, this was not "a single transaction case involving small quantities of drugs consistent with personal use." See United States v. Gomez, 164 F.3d 1354, 1356 (11th Cir. 1999) (quoting United States v. Cordova, 157 F.3d 587, 597 (8th Cir. 1998)).

Puig's third claim, that the district court failed to instruct the jury on the elements of attempted possession, likewise is meritless. The court instructed the jury not to find Puig guilty of count two unless the jurors found beyond a reasonable doubt that Puig, "aided and abetted by another person, knowingly and willfully attempted to possess a mixture or substance containing cocaine as charged and, second, that [Puig], aided and abetted by another person, attempted to possess the substance with the intent to distribute it." Cv. Doc. 1 (attachment 2 at 81-82). (Although aiding and abetting another person is not an element of the offense, the inclusion of that

additional requirement did not prejudice Puig. In any event, it comported with the evidence in this case, which showed that Herndon had aided and abetted Puig's attempted possession of the cocaine. E.g., Cr. Doc. 110 at 26-49.)

In Puig's fourth claim, he argues that the district court failed to define "constructive possession" to the jury. Cv. Doc. 1 at 12-15. Moreover, according to him, the evidence was insufficient to show that he had constructively possessed the cocaine. Id. Puig is incorrect on both points. For one thing, the court instructed the jury that "[a] person who is not in actual possession but who has both the power and the intention to later take control over something, either alone or together with someone else, is in constructive possession of it." Cv. Doc. 1 (attachment 2 at 83). For another thing, Puig was charged with attempted possession, and the evidence overwhelmingly showed that Puig had attempted to actually possess the cocaine. See United States v. Joseph, 140 Fed. Appx. 107 (11th Cir.) (evidence that defendant had agreed to buy four kilograms of cocaine, had driven his car to restaurant where deal was to take place, and had shoe box full of money with him, was sufficient to support attempted possession verdict), cert. denied, 126 S. Ct. 455 (2005).

In his fifth claim, Puig argues that the district court erred in instructing the jury on attempt without explaining to the jury that their attempt could have been "aborted." Cv. Doc. 1 at 15-18. In support of his claim, Puig asserts that his cohort Herndon, "despite having both the opportunity and ability to purchase the cocaine at

the agreed upon price, unambiguously refused to pay any money because of an increased awareness of the risk of apprehension renouncing any agreement because she had a 'change of heart.'" Cv. Doc. 1 at 16. In other words, Puig claims that Herndon decided she might get arrested so she refused to hand over their money and take the cocaine that night. Her supposed refusal to consummate the deal does not mean that she and Puig were not guilty of attempted possession, nor does it mean that they were entitled to a jury instruction based on her "change of heart." Moreover, notwithstanding Puig's statement that "mere intent to commit a specified crime does not amount to an attempt," Cv. Doc. 1 at 16, the evidence obviously went well beyond Puig's and Herndon's "mere intent." Puig and Herndon initiated a drug deal, negotiated a price, scheduled a meeting, met with the sellers, scheduled another meeting, collected the drug money, and met with the sellers again. Puig's "objective acts, taken as a whole, unequivocally mark his conduct as criminal." See United States v. Carothers, 121 F.3d 659, 662 (11th Cir. 1997) (quoted). In other words, the evidence showed that he and Herndon conspired to, and attempted to, possess the kilogram of cocaine with the intent to distribute it, as the jury found.

In his sixth claim, Puig argues that he could not have aided and abetted Herndon's possession of the cocaine because "Hendron [sic] never took constructive possession of the cocaine and her aborted criminal intent to move beyond mere preparations to constructively possess the cocaine was not a crime." Cv. Doc. 1 at 19.

As discussed in claims three and five, however, Puig was charged with attempted possession, so there was no requirement that he (or Herndon) actually or constructively possess the cocaine. The evidence overwhelmingly supported the jury's finding that Herndon and Puig had attempted to possess the cocaine.

Furthermore, Herndon's last-ditch decision not to complete the transaction that she and Puig had virtually accomplished does not change the fact that she and Puig had attempted to possess the cocaine. See United States v. Shelton, 30 F.3d 702 (6th Cir. 1994); ("withdrawal, abandonment and renunciation, however characterized, do not provide a defense to an attempt crime"); United States v. Bussey, 507 F.2d 1096, 1098 (9th Cir. 1974) ("A voluntary abandonment of an attempt which has proceeded well beyond preparation as here, will not bar a conviction for the attempt."). This Circuit has never held that renunciation is a valid defense. Even if it were, it would require evidence of "complete and voluntary renunciation," see McDowell, 705 F.2d 426, not the "I'm about to get arrested" version asserted here.

In his seventh claim, Puig argues that his trial counsel was ineffective in failing to insist that the district court provide the jury instructions discussed above. Cv. Doc. 1 at 20-25. The argument above demonstrates that Puig's lawyer did not act unreasonably in not seeking these jury instructions and that Puig was not prejudiced by the "failure."

Finally, in his eighth claim, Puig argues that his appellate counsel was

ineffective in failing to argue on appeal the jury-instructions issues discussed above. Cv. Doc. 1 at 25-26. In order to establish that appellate counsel was ineffective for failing to raise these issues on direct appeal, Puig must show that his attorney's performance was deficient and that the deficiency was prejudicial, i.e., that the "failure" to raise these issues affected the outcome of the appeal. See Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990). For the reasons discussed above, however, none of these issues had any merit; even if appellate counsel had raised these issues on direct appeal, counsel could not have demonstrated error, let alone reversible error. Therefore, counsel's failure to raise these issues on appeal was neither unreasonable nor prejudicial. See id.

Accordingly, the Court orders:

That Defendant Puig's motion to vacate Cv. Doc. 1; Cr. Doc. 130 is denied. The Clerk is directed to enter judgment against Puig in the civil case and to close that case.

IT IS FURTHER ORDERED that defendant is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, defendant "must

demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further, ' " <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n. 4 (1983)). Defendant has not made the requisite showing in these circumstances.

Finally, because Defendant is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on May 31, 2006.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

AUSA: David P. Rhodes
Anthony Walter Puig